UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **WILLIE RAY JOHNSON,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. H-08-2107** |
| | § | |
| **CDI CORPORATION,** | § | |
| | § | |
| **Defendant.** | § | |

**MEMORANDUM AND ORDER**

Pending before the Court is the Motion for Summary Judgment of Defendant CDI

Corporation ("CDI"). (Doc. No. 16.) For the following reasons, Defendant's Motion must

be granted.

I.      **BACKGROUND**

**A. Factual Background**

Plaintiff Willie Ray Johnson is a black male. Plaintiff graduated from Angelina

Junior College in 1972 with an Associate of Applied Science degree in Engineering

Technology. (Pl. Aff. ¶ 2, Aug. 12, 2009.) He received a Bachelor of Science degree in

Industrial Technology from Texas Southern University in 1977. (Pl. Aff. ¶ 2.) Plaintiff

has worked in recruiting and human resources for more than 16 years and has more than

20 years in engineering as a mechanical designer or engineer. (*Id.* at ¶ 3.) From 1993 to

2004 he operated and managed an employment agency called DiversiTech Personnel

Services that provided sourcing and recruiting services to various clients in the Houston

area. (*Id.* at ¶ 4.) Plaintiff worked at Kellogg Brown & Root ("KBR") as a recruiter from

May 2004 until April 2006, when he started work at CDI. (*Id.* at ¶ 5.) One of his former colleagues at KBR, Paul Patterson, referred him for a recruiting position at CDI.  (Pl. Aff. ¶ 10.) Patterson began working for CDI in May 2005 as a recruiter. (*Id.* at ¶ 10).

CDI is a professional services company that offers clients a cost-effective, single source provider of professional staffing and engineering and information technology outsourcing solutions. CDI hires qualified technical personnel through its recruiting department. Dorris Danner, Director of Recruiting-Process Vertical for CDI Engineering Solutions, a division of CDI, interviewed and then hired Plaintiff in 2006 for a recruiter position with a salary equivalent of $60,000 per year; Danner was Plaintiff's direct supervisor at CDI.[1] (Dorris Danner Aff. ¶¶ 8-9, July 6, 2009).  She has held her position, which involves managing talent acquisition and supervising the activity and production of recruiters, since December 2003. (Danner Aff. ¶ 2.) Before that, she was a senior account manager.

On April 11, 2006, Plaintiff began working as a Senior Project Recruiter. He was tasked with hiring engineers whereas some of his fellow recruiters were assigned to hire document control or administrative personnel. His job duties included making recruiting calls, searching databases for qualified applicants, using the RAPID system (described *infra*), Microsoft Excel, and other software for applicant information. (Danner Aff. ¶ 10.) His most important job duty was hiring qualified technical personnel to work at CDI. (*Id.* at ¶ 10.) After he was hired, Plaintiff was paired with an experienced recruiting co-

---

[1] Many of the facts provided by Defendant come from Doris Danner's Affidavit, attached as Exhibit 1 to Defendant's Motion. (Dorris Danner Aff. July 6, 2009.) Plaintiff moves to strike to particular paragraphs of the Affidavit and the Court will address this Motion in this section as it involves facts discussed in the Order.

worker who served as his mentor. (*Id.* at ¶ 13.) His initial pairing was with Jenifer Isbell, and then with Paul Patterson. (*Id.*)

In July 2006, Plaintiff volunteered to go to Baton Rouge for an assignment that required someone with an electrical background. (Danner Aff. ¶ 16.) Plaintiff contends that he was informed by one of his supervisors in Baton Rouge that the supervisor had sent an e-mail to Danner commending Plaintiff on his work and professionalism. (Pl. Aff. ¶ 7.) Eventually, however, the CDI hiring manager who requested a volunteer for Baton Rouge indicated to Danner that he would prefer someone else as his assigned recruiter.[2] (Danner Aff. ¶ 16.) In August 2006, Danner sent another recruiter, Isbell, to assist with recruiting and then ultimately hired Amy Olexy as the Baton Rouge recruiter. (Danner Aff. ¶ 17.)

Plaintiff was twice reviewed during his time at CDI. During the first review, Danner told Plaintiff that he should be prepared and versed in pulling information in RAPID[3]. (Danner Aff. ¶ 15.) She also told him that he needed to increase the number of candidates sourced and the number of hires, and he needed to enter information in RAPID accurately. (*Id.*) She conditionally approved his attendance at training seminar to be held in August 2006. (*Id.*) Danner alleges, and Plaintiff denies, that Plaintiff told her that he was getting too much training, which was a waste of time, and he just needed to recruit. (*Id.*) During the second review, after 90 days of work, Danner told Plaintiff that

---

[2] Plaintiff objects to this paragraph as well as others of Danner's Affidavit as hearsay. Danner represents that she was told by another manager that he wanted someone else because Johnson did not seem to grasp the type of engineers needed in Baton Rouge. These paragraphs are being submitted not for their truth, but rather to demonstrate that Danner was on notice of information relevant to her discharge decision. Plaintiff's Motion to Strike as to paragraphs 16, 26, 27, and 28 of Danner's Affidavit is therefore denied.

[3] RAPID is an electronic recruiting database system that CDI used to track recruiters' production levels and into which recruiters submit information about applicants and hires. Recruiters are invited to register and participate in training specific to the use of RAPID. Plaintiff elected not to participate in the classes although his co-workers did attend them. (Danner Aff. ¶ 13.)

he needed to improve his recruiting numbers by increasing the number of recruiting calls, submittals, the work process and accuracy and quality of candidate documentation in RAPID, and that he needed to increase his monthly hires to five per month. (Danner Aff. ¶ 18.) After the review, Danner informally coached Plaintiff on several occasions to help him meet his goals. (Danner Aff. ¶ 20.) Plaintiff avers that Danner told him that he had no hires in July, a fact that was belied by CDI's own hiring reports. (Pl. Aff. ¶ 8; Pl. Dep. 64:6-18.) The 90-day activity review submitted by Defendant, dated August 4, 2006, indicates that Plaintiff had no hires in July. (Doc. No. 16, Ex. 8.)

Plaintiff never met his monthly goal of five hires. (Danner Aff. ¶ 21.) In October 2006, Danner placed Plaintiff on a Performance Improvement Process ("PIP") because he had not yet demonstrated the expected level of CDI's recruiting tools, applications, work processes, and sourcing of qualified candidates. (*Id.*) The PIP warned Plaintiff that, without demonstrated improvement over the next 30 days, additional steps could be taken, including termination. (Danner Aff. ¶ 23.) Danner asked Plaintiff to prepare an action plan to include steps he would take to achieve his performance goals. (Danner Aff. ¶ 24.) Plaintiff recruited twice as many hires in November (4) as in October (2).[4] No other recruiters were placed on a PIP during Plaintiff's employment at CDI. (Danner Aff. ¶ 31.) Danner did place a white female Hiring Coordinator that she supervised on a PIP for performance reasons during that time and that person resigned shortly thereafter. (Danner Aff. ¶ 32.)

According to reports produced by RAPID, Plaintiff's recruiting activity continued to be the lowest of his peer group. (Danner Aff. ¶ 21.) Danner explains that her records on the number of hires were based on reports pulled from RAPID that the recruiters

---

[4] See the Table of Number of Hires Per Month, *infra.*

transferred to a recruiting production report. Consequently, any errors in the number of hires attributed to an employee would reflect a failure by the recruiter to properly enter or pull correct data. (Danner Aff. ¶ 22.) Plaintiff allegedly did not report any inaccuracies in his hiring numbers. (*Id.*) Plaintiff asserts that he would submit applicants to the hiring managers who would enter the names into RAPID. (Pl. Dep. 113:2-11.)

Plaintiff attests that he and Paul Patterson, a white male, had similar hiring numbers while working at CDI. Plaintiff also contends that, in November, Danner reassigned several of his candidates, including Mike Overby and Ronald Penot, to other recruiters. (Pl. Aff. ¶¶ 13, 17.) In addition, he avers that he did not receive proper credit for hiring David Comer, who was hired because of a joint effort with Mandy Pamphilis. (*Id.* at ¶ 13.) Testifying via deposition, Plaintiff was unable to recall any specific incident in which someone had taken an applicant that he felt was his. (Pl. Dep. 115:15-116:8.)

Plaintiff notes that Patterson was assigned to hire document control personnel, and other recruiters hired administrative personnel, but he was assigned to hire only engineers. (*Id.* at ¶ 14.) While document control personnel and administrative personnel do not require a college degree, engineers must have at least a four-year college degree in their course of study; consequently, the pool of applicants is purportedly larger for document control and administrative personnel than it is for engineers. (*Id.*) A table of Plaintiff and Patterson's hiring numbers is directly below. Twarina Dugas averaged 4.3 hires per month in 2006. (Danner Aff. ¶ 30.) The four remaining recruiters averaged over five hires per month in 2006. (Danner Aff. ¶ 30.)

### **Number of Hires Per Month**

| Month (2006) | Plaintiff | Patterson |
|---|---|---|
| April (Plaintiff began working April 11, 2006) | 0.0 (hires) | 13.0 |
| May | 1.0 | 3.0 |

5

| | | |
|---|---|---|
| June | 2.0 | 2.0 |
| July | 3.0 | 2.0 |
| August | 1.0 | 1.5 |
| September | 4.0 | 6.5 |
| October | 2.0 | 2.0 |
| November | 4.0 | 3.0 |
| **Total Hires** | **17.0** | **33.0** |
| *Total Excluding April* | *17.0* | *20.0* |
| **Overall Average Hires per Month** | **2.1** | **4.1** |
| *Average Excluding April* | *2.4* | *2.9* |

Danner allegedly received feedback from candidates who withdrew from consideration because they had not received sufficient information from Plaintiff. (Danner Aff. ¶ 26.) In addition, she had received complaints from hiring managers about his performance and the hiring managers requested that Plaintiff not be assigned as their recruiter. (*Id.*)

Shortly after the review, Twarina Dugas, a black female recruiter, complained that Plaintiff had used threatening language towards her and that she was afraid to work with Plaintiff. (Danner Aff. ¶ 27.) Danner then decided to terminate Plaintiff because of the complaints she had received about him and because of his unsatisfactory performance. She consulted with M.J. Celluci of Human Resources and Danner's supervisor, Rob Romaine, the Vice President of Recruiting, who agreed that Plaintiff's termination was warranted. (Danner Aff. ¶ 28.)

In October and November 2006, Plaintiff contacted Jim Sprague of Human Resources and indicated that he disagreed with his placement on PIP and that he believed that the corrective action was based on discrimination. (Pl. Aff. ¶ 18; Pl. Dep. 89:5-16.) Plaintiff never provided written descriptions of his disagreement with the PIP, and did not provide Sprague any specific instances of discrimination or corrections to the PIP. (Pl. Dep. 90:18-25). Plaintiff contends that he was fired before he had a chance to provide

Sprague a description of specific instances of discrimination. (Pl. Aff. ¶ 19.) Plaintiff does not recall any supervisor having said anything about his race while he was working at CDI. (Pl. Dep. 81:25-82:2.) However, Plaintiff avers that, at some point. Danner told him that he "talk[s] slow." (Pl. Dep. 83:16-84:5.) Plaintiff also states that, on November 29, 2006, Danner told him that she and M.J. Celluci, Director of Human Resources, are good friends. (Pl. Aff. ¶ 19.)

On November 30, 2006, Danner informed Plaintiff that he was being terminated because of unsatisfactory job performance and complaints that Danner had received both internally and externally. In addition, she stressed that his termination was based primarily on his failure to achieve his monthly recruiting goal of five hires per month, which put him at the bottom of his peer group. Danner states that she had no knowledge, at the time of Plaintiff's termination, that he had made any complaints of discrimination to Human Resources or to anyone else. (Danner Aff. ¶ 31.) She only learned of his complaints after he filed a charge with the EEOC. (*Id.*)

### B. Procedural Background

In February 2007, Plaintiff filed charges with the Equal Employment Opportunity Commission ("EEOC") and the Texas Workforce Commission ("TWC"). He alleged that he had been discriminated and retaliated against by CDI based on his gender and race in violation of Title VII of the Civil Rights Act and the Texas Labor Code. Plaintiff received his right to sue notice and timely filed a petition in the District Court of Harris County, Texas, 190th Judicial District. The case was removed to this Court, which has jurisdiction pursuant to 28 U.S.C. § 1331.

## II. RULE 56(f) MOTION

Pursuant to Rule 56(f) of the Federal Rules of Civil Procedure, Plaintiff moves to allow more discovery. The rule provides:

> Should it appear from the affidavits of a party opposing the motion that the party cannot, for reasons stated, present facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

FED. R. CIV. P. 56(f); *Beattie v. Madison County School Dist.*, 254 F.3d 595, 605 (5th Cir. 2001). Rule 56(f) Motions are viewed favorably and liberally granted. *Id.* at 605. The party must show (1) why it needs additional discovery and (2) how the discovery will create a genuine issue of material fact. *Six Flags, Inc. v. Westchester Surplus Lines, Inc.*, 565 F.3d 948, 963 (5th Cir. 2009); *Beattie*, 254 F.3d at 605. Once the party has demonstrated that diligent efforts to obtain the discovery have been unsuccessful, a 56(f) motion "should be granted almost as a matter of course." *International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1267 (5th Cir. 1991) (internal citations omitted); *Adams v. Travelers Indem. Co. of Connecticut*, 465 F.3d 156, 162 (5th Cir. 2006) (denying a Rule 56(f) motion because the summary judgment non-movant failed to diligently pursue the evidence within the time allotted for a previous continuance); *Int'l Shortstop, Inc. v. Rally's Inc.*, 939 F.2d 1257, 1267 (5th Cir. 1991). Where, in an employment discrimination case, a plaintiff seeks evidence from the defendant regarding similarly situated employees that defendant has not yet produced, a district court may properly grant a Rule 56(f) motion and defer the pending Motion for Summary Judgment. *See, e.g., Arters v Univision Radio Broadcasting TX, L.P*, 2009 WL 1313285, at *8 (N.D. Tex. May 12, 2009) (collecting cases from other circuits). As trial is near, currently scheduled for October 5, 2009, and discovery has already closed, Plaintiff has not established that a 56(f) motion is appropriate given his previous failure diligently to pursue discovery.

Plaintiff was provided documents from Defendant describing the other workers' relevant performance in Danner's department, and evidence as to whether other employees, of any race or gender, were placed on PIPs. No witness has been unavailable for deposition, and Plaintiff has provided no other exigency to demonstrate the appropriateness of additional discovery. Plaintiff's Rule 56(f) Motion shall be denied.

## III.   SUMMARY JUDGMENT

A motion for summary judgment under Federal Rule of Civil Procedure 56 requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented. FED. R. CIV. P. 56(c).  Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001) (quotations omitted).  A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party.  *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000). The Court views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.   *Id.*   Hearsay, conclusory allegations, unsubstantiated assertions, and unsupported speculation are not competent summary judgment evidence.  F.R.C.P. 56(e)(1); *See, e.g.*, *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996), *McIntosh v. Partridge*, 540 F.3d 315, 322 (5th Cir. 2008); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1975 (5th Cir. 1994) (noting that a non-movant's burden is "not satisfied with 'some metaphysical doubt as to the material facts.'" (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986))).

IV.    **TITLE VII**

**A. Standard**

Plaintiff's state employment discrimination claims may be analyzed together with his Title VII claims. *See, e.g., McClaren v. Morrison Mgmt. Specialists, Inc.*, 420 F.3d 457, 461 (5th Cir. 2005); *Wallace v. Methodist Hosp. System*, 271 F.3d 212, 219 n.10 (5th Cir. 2001). Likewise, race discrimination claims brought pursuant to Section 1981 are governed by the evidentiary framework applicable to Title VII employment discrimination claims. *See Pegram v. Honeywell*, 361 F.3d 272, 281 n.7 (5th Cir. 2004). "Title VII prohibits employers from discriminating against employees on the basis of race, color, religion, sex, or national origin." *Grimes v. Texas Dep't of Mental Health*, 102 F.3d 137, 140 (5th Cir. 1996).  Title VII claims are subject to the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). When a plaintiff alleges disparate treatment, "liability depends on whether the protected trait actually motivated the employer's decision." *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 610 (1993); *Reeves*, 530 U.S. at 141. Title VII race, color, and national origin discrimination claims are subject to the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973):

> *McDonnell Douglas* instructs that the plaintiff must first establish a *prima facie* case of [race] descrimination. . . . Once the plaintiff presents a *prima facie* case, the defendant must then articulate a legitimate, nondiscriminatory reason for the questioned employment action. . . . If the defendant is able to do so, the burden shifts back to the plaintiff to produce evidence that the defendant's articulated reason is merely a pretext for discrimination.

*Frank v. Xerox Corp.*, 347 F.3d 130, 137 (5th Cir. 2003). *See also Nasti v. CIBA Specialty Chemicals Corp.*, 492 F.3d 589, 593 (5th Cir. 2007); *Nichols v. Loral Vought Systems Corp.*, 81 F.3d 38, 40 (5th Cir. 1996); *Bodenheimer v. PPG Industries, Inc.*, 5 F.3d 955, 957 (5th Cir. 1993). If the plaintiff can establish that defendant's articulated reason is pretext, and if the *prima facie* case is sufficiently strong, a trier of fact may be able to conclude that, without additional evidence, the employer unlawfully discriminated. *See Reeves*, 530 U.S. at 148 (finding that the district court properly submitted the case to the jury). The plaintiff may also show that the defendant's articulated reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic ("mixed motive alternative"). *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003) (holding that a Title VII plaintiff need not proffer direct evidence of discrimination to pursue a mixed-motives analysis); *Richardson v. Monitronics Intern., Inc.*, 434 F.3d 327, 333 (5th Cir. 2005); *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004). If a plaintiff shows that discrimination was a motivating factor in a mixed-motives case, defendant must then respond with evidence that the same employment decision would have been made regardless of discriminatory motivation. *Rachid*, 376 F.3d at 312 n.8 (citing 42 U.S.C. § 2000e-2(m)). The employer's final burden "is effectively that of proving an affirmative defense." *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 355 (5th Cir. 2005).

To establish an inference of intentional discrimination, a plaintiff must present a prima facie case by showing: (i) he belonged to the protected class (black, male); (ii) he was otherwise qualified for his position;[5] (iii) he was discharged or suffered some

---

[5] The standard for qualification is not high:

adverse employment action by the employer; and (iv) he was replaced by someone outside his protected group or was treated less favorably than other similarly situated employees outside the protected group, under nearly identical circumstances. *St. Mary's Honor Center*, 509 U.S. at 506; *Lee v. Kansas City of Southern Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009); *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007); *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 281 (5th Cir. 2004). A plaintiff can fulfill the fourth element if he proves that he suffered an adverse employment action under circumstances in which an employee of a different race would not have suffered that action, irrespective of the race of his eventual replacement, if there is one. *See, e.g., EEOC v. Brown & Root, Inc.*, 688 F.2d 338, 340-341 (1982). An employee who proffers a fellow employee as a comparator must demonstrate that the employment actions at issue were taken "under nearly identical circumstances." *Lee*, 574 F.3d at 260. The employment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories. *Id.* The comparator employees' track records need not comprise the identical number of identical infractions, but the records must be comparable. *Id.*

If the defendant meets its burden of production, "the *McDonnell Douglas* framework—with its presumptions and burdens" disappears, and "the sole remaining

---

[A] plaintiff challenging his termination or demotion ... can ordinarily establish a prima facie case of [discrimination] by showing that he continued to possess the necessary qualifications for his job at the time of the adverse action ....By this we mean that plaintiff had not suffered physical disability or loss of a necessary professional license or some other occurrence that rendered him unfit for the position for which he was hired.

*Berquist v. Washington Mut. Bank*, 500 F.3d 344, 350 (5th Cir. 2007) (quoting *Bienkowski v. American Airlines, Inc.*, 851 F.2d 1503, 1506 & n.3 (5th Cir. 1988)).

issue" is "'discrimination vel non.'" *Reeves*, 530 U.S. at 142-43 (citing *St. Mary's Honor Center*, 509 U.S. at 510)). The "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves*, 530 U.S. at 143 (citing *Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). To satisfy that burden, the plaintiff "may attempt to establish that he was the victim of intentional discrimination 'by showing that the employer's proffered explanation is unworthy of credence.'" *Id.* (citing *Burdine*, 450 U.S. at 256); *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003); *see also Gee v. Principi*, 289 F.3d 342, 347-48 (5th Cir. 2002) (finding that an employer's inconsistent explanations for its employment decisions at different times may permit a jury to infer that the proffered reasons are pretextual).

Importantly, "although the presumption of discrimination drops out of the picture once the defendant meets its burden of production, the trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom' . . . on the issue of whether the defendant's explanation is pretextual." *Reeves*, 530 U.S. at 143 (citing *St. Mary's Honor Center*, 509 U.S. at 510; *Burdine*, 450 U.S. at 255, n. 10). On the other hand, even if the plaintiff presents some evidence that the defendant's legitimate non-discriminatory reason is false or a pretext, "such a showing will not always be enough to prevent summary judgment, because there will be cases where a plaintiff has both established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, yet 'no rational factfinder could conclude that the action was discriminatory.'" *See Price v. Federal Exp. Corp.*, 283 F.3d 715, 720 (5th Cir. 2002) (citing *Reeves*, 530 U.S. at 148). As the Supreme Court has explained, "[i]t is

not enough . . . to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination." *St. Mary's Honor Center*, 509 U.S at 511. In a case in which plaintiff shows a defendant's legitimate, non-discriminatory reason is false, "[w]hether summary judgment is appropriate depends on numerous factors, including 'the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered.'" *Price*, 283 F.3d at 720 (citing *Reeves*, 530 U.S. at 148-49.); *see also Vadie v. Miss. State Univ.*, 218 F.3d 365, 374 n. 23 (5th Cir. 2000) (stating that a plaintiff can avoid summary judgment when the "evidence taken as a whole (1) creates a fact issue as to whether each of the employer's stated reasons was what actually motivated the employer and (2) creates a reasonable inference that [race] was a determinative factor in the actions of which the plaintiff complains").

### B. Analysis

#### 1. Prima Facie Case of Race Discrimination

Here, Plaintiff has satisfied elements one through three of a prima facie case. He is a black male, who, through his experience as a recruiter, was qualified for the position, and he was terminated. Defendant contends that Plaintiff was not qualified for his position because he was not skilled in RAPID and failed to meet his performance target of five hires per month. Based on the standard enunciated in *Berquist*, however, Plaintiff was qualified for his job. Plaintiff has worked in recruiting and human resources for more than 16 years and has more than 20 years experience in engineering as a mechanical designer or engineer. While Defendant avers that Plaintiff's job performance was

unsatisfactory during his period of employment, he suffered nothing that would render him unfit for the job for which he was hired. *Berquist*, 500 F.3d at 350.

Plaintiff claims that he was terminated while Patterson, a white male with similar hire numbers, was not. The hiring chart reproduced above indicates that the hiring numbers attributed to Plaintiff and Patterson are much closer than Defendant contends, particularly since Plaintiff began working at CDI well into the month of April, rendering this month somewhat irrelevant to the comparison. Nonetheless, Plaintiff has not met the "similarly situated" standard articulated in *Lee*. While Patterson did have similar hiring numbers, he did not have complaints made against him by other candidates and CDI employees, as Plaintiff did. *See Lee*, 574 F.3d at 261 (stating that "[e]ach employee's track record at the company need not comprise the identical number of identical infractions, albeit these records must be comparable"); *see also McKinney v. JB Hunt Transp. Inc.,* 193 Fed.Appx. 373, 374 (5th Cir. 2006) (unpublished) (per curiam) (plaintiff had numerous complaints against her and instances of unprofessional conduct unlike her proffered comparator). Thus, Defendant's assessment of Plaintiff's performance deficiencies took into account significant factors not present with other candidates, including Patterson. Therefore, because Plaintiff cannot meet the fourth element of the *McDonnell Douglas* framework, he fails to make out a prima facie case of race discrimination.

Plaintiff also contends that his race motivated the decision to cancel the opportunity for him to attend the training seminar. Danner states that this decision was made in order to give Plaintiff the opportunity to focus on improvement of his recruiting skills in light of his previous poor performance (Danner Aff. ¶ 19.) Absent additional

evidence demonstrating discriminatory intent on the part of the employer, Plaintiff's subjective belief alone is insufficient to make out a prima facie case of discrimination. *See Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 427 (5th Cir. 2000) (rejecting plaintiff's reliance on subjective belief regarding defendant's discriminatory intent); *Myers v. Dallas Independent School Dist.*, 206 Fed.Appx. 401, 402-03 (5th Cir. 2006) (unpublished) (finding neither plaintiff's "unsubstantiated assertions nor his subjective belief" that he was subject to discrimination sufficient to raise a material fact issue). Here, Plaintiff offers no evidence that the decision to terminate his opportunity to attend the training seminar is attributable to his race. Therefore, Plaintiff's allegations do not create a material fact issue.

## 2. Prima Facie Case of Sex Discrimination

Plaintiff contends that he was discriminated against on the basis of his sex when he was sent to Baton Rouge because he was male. (Pl. Dep. 78:12-23.) However, as with his racial discrimination claim, Plaintiff offers no evidence that the decision to send him to Baton Rouge is attributable to his sex. In fact, that Defendant sent female recruiters to Baton Rouge after receiving unfavorable feedback regarding Plaintiff directly contradicts Plaintiff's stated belief that the assignment was given to him because he is male.

Plaintiff avers that his termination constitutes sex discrimination. Plaintiff points to the fact that Defendant hired a white female recruiter after his discharge. While this fact can support an inference of employment discrimination, mere replacement by a person not within a protected class, without more, is insufficient for establishing a prima facie case of discrimination. *See Byers*, 208 F.3d at 427; *Nieto v. L & H Packing Co.*, 108 F.3d 621, 624 n. 7 (5th Cir. 1997). Plaintiff offers no additional evidence other than his

16

subjective belief that sex was a factor in his termination. Thus, he fails to make out a prima facie case of discrimination on the basis of sex.

Because Plaintiff has failed to make out a prima facie case of race and sex discrimination, it is unnecessary for the Court to discuss Defendant's proffered non-discriminatory reason for his termination.

## V. RETALIATION

"It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice ... or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing...." 42 U.S.C. § 2000e-3. A plaintiff may establish a prima facie case of unlawful retaliation by demonstrating: "1) [he] engaged in protected activity, 2) [he] suffered an adverse employment decision, and 3) a causal link exists between the protected activity and the adverse employment decision." *Washburn v. Harvey*, 504 F.3d 505, 510 (5th Cir. 2007). *Medina v. Ramsey Steel Co., Inc.*, 238 F.3d 674, 684 (5th Cir. 2001); *Arensdorf v. Paulson*, No. 6-cv-3324, 2008 WL 4411597 (S.D. Tex. Sept. 29, 2008). The burden shifting analysis for Title VII discrimination claims is equally applicable to retaliation claims. *Long v. Eastfield Coll.*, 88 F.3d at 305.

Protected activity includes opposing an employment practice protected under Title VII, making a charge of discrimination, or testifying, assisting, or participating in an investigation or proceeding under Title VII. *Mota v. Univ. Of Texas Houston Health Science Center*, 261 F.3d 512, 519 (5th Cir. 2001). An adverse employment action must "affect employment" or "alter the conditions of the workplace." *Burlington Northern &*

*Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62, 67 (2006) (holding that Title VII's substantive provision and anti-retaliation provision are not coterminous and explaining the scope of the Title VII substantive provision). To establish a causal link, an employee "should demonstrate that the employer knew about the employee's protected activity." *Manning v. Chevron Chem. Co.*, 332 F.3d 874, 883 (5th Cir. 2003).

Defendant contends that Danner, the decisionmaker who initiated Plaintiff's termination, did not then know about Plaintiff's discussion of discrimination with Sprague. (Danner Aff. ¶ 31.) Danner attests that she consulted with Celluci of Human Resources and her supervisor, Rob Romaine, the Vice President of Recruiting, and they collectively decided that Plaintiff's termination was warranted. (Danner Aff. ¶ 28.)

In his e-mail of November 27, 2008, requesting that Plaintiff provide specific instances to substantiate Plaintiff's claim of discrimination, Sprague told Plaintiff that he could respond to either Celluci or Sprague. (Doc. No. 16, Ex. 16.) Sprague informed Plaintiff that his response would be kept confidential and marked the e-mail as confidential.[6] (*Id.*) Plaintiff notes that he did not send Sprague an e-mail with specific instances to substantiate his allegation of discrimination because he was terminated before he could do so, although he had planned to. (Pl. Dep. 90:18-91:3.) Plaintiff moves to re-open discovery to learn whether Danner knew about Plaintiff's discrimination claim at the time of his termination. Plaintiff's belief that she may have learned about his complaint prior to his termination rests on Danner's apparent friendship with Celluci who also worked in Human Resources with Sprague. Danner, however, consulted with Celluci, not Sprague, in making the termination decision; therefore, if Plaintiff provided

---

[6] Plaintiff does not contend that this e-mail creates a fact issue as to whether Celluci knew of Plaintiff's discrimination charge at the time that Celluci conferred with Danner as to his termination. Celluci does not appear to have been copied on the e-mail.

any factual basis to substantiate a belief that Celluci knew of Plaintiff's discrimination allegations prior to his termination, Plaintiff would have created a fact question. He did not. Consequently, Plaintiff has failed to demonstrate a material fact issue sufficient to overcome Defendant's Motion as to this claim. *See Septimus v. Univ. of Houston*, 399 F.3d 601, 611 (5th Cir. 2005) (holding that "mere speculation" of retaliation cannot demonstrate pretext).

## VI. HOSTILE WORK ENVIRONMENT/HARASSMENT

Plaintiff also argues that he was subjected to unwelcome harassment that affected a term, condition, privilege of employment sufficient to indicate a fact issue in Plaintiff's hostile work environment claim. This argument also fails.

First, Plaintiff did not exhaust his hostile work environment claim. A Title VII plaintiff must exhaust his administrative remedies before filing suit in federal court. *See Pacheco v. Mineta*, 448 F.3d 783, 788 & n.7 (5th Cir. 2006) (explaining that the Fifth Circuit is split over whether administrative exhaustion is a prerequisite to suit or a requirement that implicates subject matter jurisdiction). The scope of the judicial complaint is limited to the scope of the EEOC investigation that could reasonably be expected to grow out of a charge of discrimination. *McClain v. Lufkin Industries, Inc.*, 519 F.3d 264, 274 (5th Cir.), *cert denied* 129 S.Ct. 198 (2008); *National Ass'n of Government Employees v. City Public Service Bd. of San Antonio, Tex.*, 40 F.3d 698, 711 (5th Cir. 1994); *O'Neal v. Roadway Exp.*, 181 Fed. Appx. 417 (5th Cir. 2006) (not designated for publication) (dismissing the plaintiff's claims for failure to exhaust administrative remedies because there was no evidence that the EEOC either was constructively or actually aware of the incidents alleged to have occurred after the

plaintiff filed his EEOC charge). The proper standard is not the scope of the actual investigation but what the court would reasonably expect the EEOC to investigate, although the investigation of a particular claim "creates a strong inference that a claim was presented." *See Clark v. Kraft Foods, Inc.*, 18 F.3d 1278, 1281 (5th Cir. 1994).

Here, on his EEOC charge, Plaintiff checked only the boxes for race and retaliation. (Doc. No. 16, Ex. 12.) "[T]he scope of an EEOC charge should be liberally construed for litigation purposes because Title VII 'was designed to protect the many who are unlettered and unschooled in the nuances of literary draftsmanship.'" *McClain*, 519 F.3d at 273 (quoting *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 465 (5th Cir. 1970)). In addition, the administrative exhaustion requirement is designed to put employers on notice of "the existence and nature of charges against them." *See, e.g.*, *Manning v. Chevron Chemical Co., LLC*, 332 F.3d 874, 878 (5th Cir. 2003) (quoting *EEOC v. Shell Oil Co.*, 466 U.S. 54 (1984)). Plaintiff describes only the conduct related to this retaliation claim and his termination claim. He does not mention the purportedly hostile statements made by Danner. Plaintiff's claim must be dismissed because he did not properly exhaust it through the EEOC process.

Even had he exhausted his claim, he does not allege facts sufficient to survive a motion for summary judgment as to his hostile work environment claim. In order for evidence to sufficiently ground a claim of harassment, the plaintiff must prove (i) he was a member of a protected class (ii) he was subject to unwelcome harassment (iii) the harassment was motivated by his membership in a protected class; (iv) harassment affected a term or condition of his employment; and (v) the employer knew or should have known of the harassment in question and failed to take prompt remedial action.

*Harvill v. Westward Communications,* LLC, 433 F.3d 428, 434 (5th Cir. 2005) (describing elements for harassment by a coworker); *Frank v. Xerox Corp.*, 347 F.3d 130, 138 (5th Cir. 2003); *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 353 (5th Cir. 2001). The Fifth Circuit distinguishes harassment by a supervisor from that of a co-worker—the fifth element is not required to establish a prima facie case of harassment in the case of a supervisor. *Aryain v. Wal-Mart Stores Texas LP*, 435 F.3d 473, 479 n.3 (5th Cir. 2008); *Sharp v. City of Houston*, 164 F.3d 923 (5th Cir. 1999) (holding that a negligence standard governs employer liability for co-worker harassment). *See also Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998).

"[B]ecause liability is predicated on misuse of supervisory authority, the touchstone for determining supervisory status is the extent of authority possessed by the purported supervisor." *Parkins v. Civil Constructors of Illinois, Inc.*, 163 F.3d 1027, 1033 (7th Cir. 1998). Specifically, a supervisor should have the ability to hire and fire, demote or promote, and transfer or discipline an employee. *Id.* at 1033. A supervisor properly subject to vicarious liability for misuse of supervisory authority generally has the ability to hire and fire, discipline, or otherwise supervise aspects of the subordinate employees' work assignments. *See, e.g., Faragher v. City of Boca Raton*, 524 U.S. at 781 (describing the duties of the supervisors at issue in that case). *See also, Sharp v. City of Houston*, 164 F.3d at 929-930.

Plaintiff does not respond to Defendant's arguments concerning his harassment claim. He does not dispute, therefore, that Danner was his supervisor for purposes of the harassment claim. In his deposition, Plaintiff contends that he was harassed because Danner told Plaintiff that he was from KBR, that he was no good, and that he was being

overpaid. (Pl. Dep. 100:11-101:23.) Plaintiff contends that these statements were based on his race. (Pl. Dep. 101:4-20.) However, the Court finds no evidence, other than Plaintiff's belief, that these statements were race-related. As previously discussed, Plaintiff cannot rely solely on his subjective belief that he was subject to racially motivated harassment in order to get beyond summary judgment. *See Byers*, 209 F.3d at 427 (rejecting plaintiff's reliance on subjective relief regarding discriminatory intent). Therefore, the Court cannot conclude that these statements relate to race or sex sufficient to create a fact issue over Plaintiff's harassment claim.[7]

## VII.   EMOTIONAL DISTRESS

---

[7] It is also doubtful that these comments were severe or pervasive enough to constitute harassment. The plaintiff must subjectively perceive the harassment as sufficiently severe or pervasive and the subjective perception must be objectively reasonable. *Aryain v. Wal-Mart Stores Texas LP*, 534 F.3d 473, 479 (5th Cir. 2008).. The fact-finder must consider the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it interferes with the employee's work performance. *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101,116-17 (2002); *Lauderdale v. Texas Dept. of Criminal Justice, Institutional Div.*, 512 F.3d 157, 163 (5th Cir. 2007) (citing *Harris v. Forklift Sys.*, 510 U.S. 17, 23 (1993) (holding that the conduct need not be psychologically injurious as long as the environment is reasonably perceived as hostile or abusive. The Fifth Circuit has held that even egregious conduct does not create such an abusive environment where it is infrequent and did not unreasonably interfere with work performance such that plaintiff's opportunity to succeed in the workplace was impaired. *Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317, 328 (5th Cir. 2004) (holding that comments to plaintiff about another employee's body, slapping the plaintiff on the behind with a newspaper, grabbing or brushing up against the plaintiff's breasts and behind, and attempting to kiss the plaintiff were not severe as a matter of law); *Shepherd v. Public Comptroller of Public Accounts of State of Texas*, 168 F.3d 871, 874 (5th Cir. 1999) (holding that several inappropriate comments and touchings, including rubbing the plaintiff's arm from shoulder to wrist, were not severe). "Frequent incidents of harassment, though not severe, can reach the level of 'pervasive.'" *Lauderdale*, 512 F.3d at 163. Plaintiff's allegations regarding Danner's comments are neither as severe nor as pervasive as conduct that satisfies the standard for a harassment claim. *See, e.g. Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 438 (5th Cir. 2007) (distinguishing cases of egregious, persistent racially motivated statements and granting summary judgment for the defendant even though the plaintiff's supervisor referred to inner city children as "ghetto children" and had allegedly expressed surprise when the plaintiff said that she shopped at an upscale shopping center, owned a Volvo, and that her son bought and sold cars as a hobby). "[S]imple teasing, offhand comments, and isolated incidents, (unless extremely serious) will not amount to discriminatory charges" that can survive summary judgment." *Turner*, 476 F.3d at 348 (internal citations omitted). Even had Plaintiff's termination been motivated by an improper purpose, it is not a separate incident of a "hostile work environment." *See Parker v. State of Louisiana Dept. of Educ. Special School Dist.*, No. 08-30984, 323 Fed. Appx. 321, 327 (5th Cir. 2009) (not designated for publication).

Plaintiff claims that he suffered emotional distress, but does not respond to Defendant's arguments moving to dismiss his claim. Because his claims for emotional distress mirror those of his Title VII claims, they must be dismissed.

To recover damages for intentional infliction of emotional distress (IIED), a plaintiff must establish that: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe. *Hoffmann-La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 445 (Tex. 2004) (internal citations omitted). IIED is a gap-filler tort and "[w]here the gravamen of a plaintiff's complaint is really another tort, intentional infliction of emotional distress should not be available." *Hoffmann-La Roche Inc. v. Zeltwanger*, 144 S.W.3d at 447 (collecting cases). Likewise, "[i]f the gravamen of a plaintiff's complaint is the type of wrong that the statutory remedy was meant to cover, a plaintiff cannot maintain an intentional infliction claim regardless of whether he or she succeeds on, or even makes, a statutory claim." *Id.* at 448. The factual predicates for Plaintiff's IIED claim are the same as those used to support Plaintiff's Title VII claims for wrongful termination and retaliation, and, therefore, may not separately support an IIED claim. *See, e.g., Zeltwanger*, 144 S.W.3d at 447-48 (holding that a Chapter 21 sexual harassment retaliation claim precluded an IIED claim based on the same facts); *Louis v. Mobil Chemical Co.*, 254 S.W.3d 602, 609 (Tex. App.—Beaumont 2008, no pet.) (holding that discrimination in the workplace is only actionable through employment discrimination statutes); *Southwestern Bell Mobile Systems, Inc. v. Franco*, 971 S.W.2d 52, 54 (Tex. 1998) (holding that even a wrongful termination may not support an IIED action).

Plaintiff alleges that he suffered wounded pride, shame, despair and utter devastation resulting from the treatment he received while employed with Defendant. (Original Petition, ¶ 9.) However, because these allegations are predicated on those facts that serve as the basis of his Title VII claim, Plaintiff's emotional distress claim must be dismissed.

## VIII.   MOTION TO STRIKE

Plaintiff moves to strike from Defendant's Motion for Summary Judgment records from the TWC and the EEOC on the grounds that they are hearsay and irrelevant. EEOC Letters of Determination are admissible under the F.R.E. 803(8)(C) public records hearsay exception,  and they are probative of a claim of discrimination. *See DeCorte v. Jordan,* 497 F.3d 433, 440 (5th Cir. 2007). Their findings, however, are not dispositive in civil suits. *See, e.g., Price v. Federal Express Corp.,* 283 F.3d 715, 725 (5th Cir. 2002); *Price v. Rosiek Const. Co.,* 509 F.3d 704, 709 (5th Cir. 2007). Moreover, an EEOC determination alone is not sufficient to contradict a defendant's nondiscriminatory reason for an adverse employment action. *See Mosley v. Marion County, Miss.,* 111 Fed. Appx. 726, at *2 (5th Cir.2004). Consequently, the TWC record and the EEOC determinations will not be struck for the limited purpose described above.

## IX.   CONCLUSION

Plaintiff's renewed Rule 56(f) Motion (Doc. No. 25)  is **DENIED**. Plaintiff's Motion to Strike (Doc. No. 25) is **DENIED**. Defendant's Motion for Summary Judgment (Doc. No. 16) is **GRANTED.**

**IT IS SO ORDERED**.

**SIGNED** this _8th_ day of September, 2009.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE